United States District Court
Southern District of Texas
**ENTERED**
October 21, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA,        §
                                 §
        Plaintiff/Respondent,    §
                                 §
v.                               §        CRIMINAL NUMBER H-19-633-01
                                 §        (CIVIL ACTION NO. H-24-1096)
OLOTIN ALFRED ALATAN,            §
REG. NO. 99813-479,              §
                                 §
        Defendant/Petitioner.    §

## MEMORANDUM OPINION AND ORDER

Olotin Alfred Alatan ("Petitioner") was convicted in this court of health care fraud offenses and sentenced to 120 months in prison.[1] Pending before the court are Petitioner's Motion for Sentence Reduction Under U.S.C. 3582(c)(1) Extraordinary and Compelling Reasons ("Motion for Compassionate Release") (Docket Entry No. 367) and Petitioner's Motion to Vacate, Set Aside or Correct A Sentence Under 18 U.S.C. Section 2255 ("Petitioner's § 2255 Motion") (Docket Entry No. 373).[2] For the reasons stated below, Petitioner's Motion for Compassionate Release and Petitioner's § 2255 Motion will be denied.

_____

[1]Judgment in a Criminal Case, Docket Entry No. 250, pp. 1-3.

[2]Petitioner also filed a Motion for Sentence Reduction Under 18 U.S.C. 3582(c)(2) Amendment 821 and Retroactive Criminal History Score Adjustments (Docket Entry No. 366), which the court denied. See Order Regarding Motion for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(2), Docket Entry No. 368.

## I.  Background

Petitioner and codefendants were first indicted in this case on August 28, 2019.[3]  In an April 6, 2022, Superseding Indictment, Petitioner was charged with one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 (Count 1), eight counts of health care fraud in violation of 18 U.S.C. § 1347 (Counts 2 through 9), and one count of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 (Count 16).[4]

### A.  Petitioner's Trial and Sentencing

At trial the Government presented testimony from a Medicare fraud analyst, Shauna Hull.[5]  Hull explained how the home health care business and Medicare billing work.  Hull testified that for patients to qualify for home health care coverage under Medicare, "[t]hey have to be homebound.  And that means that they have to have either a medical need that they have to be at home or they have some kind of impairment or need the assistance of another person to be able to leave the home.  And they also have to have a normal inability to leave the home."[6]  Hull testified that home health care is initiated by a referral from the patient's

---

[3]Indictment, Docket Entry No. 1.

[4]Superseding Indictment, Docket Entry No. 119, pp. 5, 10-12.

[5]Jury Trial – Day 1 Official Reporter's Transcript of Proceedings ("Day 1 Trial Transcript"), Docket Entry No. 297, p. 58 lines 3-16, p. 59 lines 18-24.

[6]<u>Id.</u> at 66 lines 1-9.

physician, typically after a medical event or new diagnosis that raises new needs, such as a stroke or the unexpected onset of diabetes.[7]  The home health agency is supposed to evaluate the patient's needs and send a plan-of-care form to the patient's physician for approval.[8]  Hull testified that Medicare requires the physician to have a face-to-face visit with the patient before signing the plan of care, and the physician must certify that the patient is homebound.[9]

Hull testified about several red flags that indicate fraud in home health care, including the use of recruiters to find patients, contradictory information in a patient's forms, patients being located long distances from the home health care business, or the fact that a home health care agency's plans of care are all signed by a single doctor.[10]

The Government introduced Petitioner's signed Medicare Application Section 15 Certification Statement from 2012, in which Petitioner agreed to be bound by Medicare laws and regulations.[11]

_____

[7]Id. at 60 lines 9-25, p. 61 lines 1-21.

[8]Id. at 62 lines 21-25, p. 63 lines 1-7, p. 64 lines 13-25, p. 65 lines 1-3; Home Health Certification and Plan of Care (Government's Exhibit 24A), Docket Entry No. 168-1.

[9]Day 1 Trial Transcript, Docket Entry No. 297, p. 65 lines 7-21; Home Health Certification and Plan of Care (Government's Exhibit 24A), Docket Entry No. 168-1, p. 1 ¶ 26.

[10]Day 1 Trial Transcript, Docket Entry No. 297, p. 62 lines 8-20, p. 69 lines 21-25, p. 70 lines 1-23.

[11]Id. at 71 lines 11-25, p. 72 lines 1-4; Section 15: Certification Statement (Government's Exhibit 1A), Docket Entry No. 167-1 ¶ B.

The Government called Federal Bureau of Investigation (FBI) Agent Paul Nixon to testify about the investigation of Petitioner's home health care business, The Colony, and an affiliated business, Milten's Clinic.[12]  The FBI became interested in a physician working with Milten's Clinic — Dr. John Ramirez — because Milten's Clinic was billing Medicare "in excess of 72 hours a day on some days for Dr. Ramirez."[13]  After some undercover operations, the FBI obtained search warrants to search Milten's Clinic and The Colony.[14]  The FBI executed the search warrants on August 25, 2015, collecting hundreds of banker's boxes of documents, including business records, patient files, checks, and financial records.[15]  The FBI interviewed employees of Milten's Clinic and The Colony and ultimately indicted Petitioner along with several coconspirators.

Rita Kpotie Smith, one of Petitioner's codefendants, testified that she was an employee of Milten's Clinic and that she had informally worked with The Colony.[16]  Smith testified that The Colony paid patient recruiters to find people on Medicare, verified their Medicare eligibility, and sent their information to Milten's

---

[12]Jury Trial – Day 3 Final Day Official Reporter's Transcript of Proceedings ("Day 3 Trial Transcript"), Docket Entry No. 299, p. 3 lines 23-25, p. 4 lines 1-6, p. 53 lines 8-13.

[13]Id. at 53 lines 11-16.

[14]Id. at 56 lines 21-25.

[15]Id. at 56 lines 21-25, p. 61 lines 13-20.

[16]Jury Trial – Day 2 Official Reporter's Transcript of Proceedings ("Day 2 Trial Transcript"), Docket Entry No. 298, p. 5 lines 5-14, p. 7 lines 14-16, p. 24 lines 3-25, p. 25 lines 1-4.

Clinic.[17]   Smith testified that the Milten's Clinic physicians —
Dr. Ramirez or Dr. Sayeed — would purport to see the patients and
evaluate their need for home health care.[18]   But Smith testified
that in reality, Drs. Ramirez and Sayeed almost never saw the
patients and instead sent foreign medical graduates ("FMGs") with
no U.S. medical license to evaluate the patients.[19]   The Colony then
sent nurses to see the patients and sign them up for home health
care.[20]   Smith equivocated on whether there were some patients that
actually needed home health care but confirmed that some did not,
that The Colony's business model was "backwards" in that patients
were recruited by The Colony and sent to Milten's Clinic for
evaluation, and that recruited patients generally do not need home
health care.[21]

Michael Sangolana, a nurse employed by The Colony, testified
that he visited the patients to fill out their plans of care, which
were then signed by Dr. Ramirez without speaking to Sangolana.[22]
Sangolana testified that he falsely wrote that the patients were
homebound on the plans of care and other paperwork to qualify them

---

[17]Id. at 45 lines 12-16, p. 46 lines 8-10.

[18]Id. at 48 lines 24-25, p. 49 lines 15-20.

[19]Id. at 49 lines 2-20; Home Health Certification and Plan of
Care, Docket Entry No. 168-1, p. 1 ¶¶ 24, 27.

[20]Day 2 Trial Transcript, Docket Entry No. 298, p. 87 lines
11-13.

[21]Id. at 49 lines 24-25, p. 50 lines 1-15, p. 65 lines 18-25.

[22]Id. at 178 lines 1-25, p. 179 lines 1-3, p. 181 lines 15-17.

for home health care coverage.[23]   Sangolana testified to this falsification with respect to each of the four specific patients referenced in Counts 2 through 9 of the Superseding Indictment.[24] Sangolana testified that he knew The Colony's business was wrong but that he looked the other way and falsified patients' conditions as he was expected and instructed to do.[25]  Once the paperwork was filled out by Sangolana and signed by Dr. Ramirez, The Colony could start billing Medicare for home health care services.[26]

The Government offered the testimony of two patients of The Colony who stated that they did not need home health care, that they had not seen Dr. Ramirez or Dr. Sayeed, and that their Colony paperwork was false in stating that they were homebound.[27]

Multiple Colony employees testified that Petitioner had intimate knowledge of and directed The Colony's fraudulent business.   Smith, Sangolana, Edem Ekene (The Colony's office manager), and Susan Bermudez (who handled Medicare billing for Milten's Clinic and The Colony) all testified that Petitioner was in The Colony office on a daily basis except for his periodic trips

---

[23]_Id._ at 179 lines 17-25, p. 181 line 25, p. 182 lines 1-9, p. 184 lines 21-25, p. 185 lines 1-9.

[24]_Id._

[25]_Id._ at 173 lines 5-14, p. 174 lines 10-16, p. 182 lines 5-25.

[26]_Id._ at 49 lines 21-23.

[27]_Id._ at 150 lines 1-7, p. 151 lines 4-11, p. 155 lines 2-25, p. 156 lines 1-6 [Cathy Farris]; p. 160 lines 7-13, p. 165 lines 13-24, p. 166 lines 11-16 [Crusita Nava].

to Nigeria.[28]   Sangolana confirmed that Petitioner was an "active" owner of the business.[29]   Smith testified that Petitioner "knew everything that was going on at The Colony."[30]   Petitioner was aware of and communicated with The Colony's patient recruiters.[31] According to Smith, every recruiter had to be approved by Petitioner.[32]   Petitioner signed the checks to pay recruiters.[33] When Petitioner was away, Smith was required to obtain Petitioner's approval before filling out checks he left in the office and had to explain to Petitioner what the checks were for.[34]   Witnesses

---

[28]Id. at 56 lines 7-11 ("Q. First of all, how often was Alfred Alatan in the office?  A.  He was gone a lot of times.  But if he was in the country, he was in the office."); p. 177 lines 16-18 ("Q.  Would you say that [Petitioner] was there daily?  Like a lot of times he would --  A.  Yes.  I would say that, yes."); p. 209 lines 1-3 ("Q.   Okay.   And was Alfred Alatan in the office regularly when he was in -- not traveling to Nigeria?  A.  Yes."). Day 3 Trial Transcript, Docket Entry No. 299, p. 21 lines 15-16 ("Q. How frequently was defendant Alatan at The Colony?  A.  If he was in town, almost every day.").

[29]Id. at 177 lines 19-20 ("Q.  So [Petitioner] was an owner that was active in the office?  A.  Yes, ma'am.").

[30]Id. at 56 lines 12-13; see also id. at 75 lines 15-17 ("Q.  Yes.  And at Colony, it was Alfred Alatan that had all the authority to sign off on things?  A.  That's Correct.").

[31]Id. at 50 lines 16-25, p. 51 lines 1-5; Day 3 Trial Transcript, Docket Entry No. 299, p. 21 lines 23-25, p. 22 lines 1-8.

[32]Day 2 Trial Transcript, Docket Entry No. 298, p. 50 line 25, p. 51 lines 1-5.  Smith also testified that there was at least one patient recruiter working with The Colony before Smith got involved.  Id. at 41 lines 7-10.

[33]Id. at 212 lines 24-25, p. 213 lines 1-4.

[34]Id. at 57 lines 5-8, 18-25, p. 58 lines 1-3.

testified that The Colony continued to operate the same way after the FBI raid with the only difference being that Dr. Sayeed filled the role of Dr. Ramirez.[35]  Petitioner did not tell his employees to change the way they were operating after the FBI raid.[36]

Agent Nixon, summarizing the financial records, testified that Medicare paid The Colony over $4.5 million for home health care services from December 2012 through June 2016 into The Colony's bank account controlled by Petitioner.[37]  Nixon testified that Petitioner transferred over $3.5 million out of that account into another account he controlled, from which he paid over $3.1 million to others involved in the scheme including $350,000 to patient recruiters.[38]

Petitioner's trial counsel, Gus Saper, made an opening statement, cross-examined the witnesses that testified to Petitioner's knowledge, and made a closing statement.  Given the overwhelming evidence of fraud at Milten's Clinic and The Colony, Saper presented the narrative that Petitioner — in dire straits

---

[35]Id. at 89 lines 9-13 ("Q.  So Michael Sangolana was still doing the same thing [ap]proving people that did not need home health services and Alatan was signing checks after [the] FBI had raided The Colony?  A.  That's correct."); p. 237 lines 5-13.

[36]Id. at 237 lines 11-13; Day 3 Trial Transcript, Docket Entry No. 299, p. 52 lines 4-9.

[37]Day 3 Trial Transcript, Docket Entry No. 299, p. 85 lines 17-25, p. 86 lines 1-24.

[38]Id. at 87 lines 12-19, p. 88 lines 12-15; Government's Exhibit 28, Docket Entry No. 170, p. 1.

after the incapacitation of his romantic partner and having multiple other businesses to run and a son to care for — handed over operational control of The Colony to Smith and trusted The Colony's employees.[39]   To explain the fact that Petitioner's signature was on all of The Colony's checks, Saper emphasized that Petitioner was often out of the country or tending to his other businesses and left presigned checks or signature stamps in the office.[40]   To explain evidence that The Colony continued to operate the same way after the FBI raid, Saper emphasized that Petitioner was in Nigeria at the time, that he learned about it some time later, and that Petitioner's employees concluded that the raid had to do with Dr. Ramirez's conduct.[41]

Saper focused his cross-examination on the witnesses whose testimony showed Petitioner's knowledge and involvement in the fraud, such as Sangolana, Ekene, and especially Smith.  Saper emphasized confusing or inconsistent parts of the witnesses' testimony, drew out what they stood to gain from testifying against Petitioner, and emphasized the absence of documentary evidence of Petitioner's knowledge aside from the checks.  When Smith testified that The Colony's employees copied Petitioner on emails to the accountant asking for payment approvals, Saper pointed out that no

_____

[39]Day 1 Trial Transcript, Docket Entry No. 297, p. 47 lines 4-21, p. 48 lines 1-23, p. 51 line 25, p. 52 lines 1-4.

[40]Id. at 48 lines 20-25, p. 49 lines 1-23.

[41]Id. at 50 line 25, p. 51 lines 1-15.

such emails were offered into evidence.[42]  Saper forced witnesses
— including Smith — to admit that they personally saw Petitioner
sign checks only a small number of times.[43]  Saper pointed out the
large  portions  of  the  fraud's  proceeds  that  were  paid  to
Petitioner's subordinates.[44]  Saper questioned Smith about a side
scheme she had with Bermudez in which they sold some plans of care
signed  by  Drs.  Ramirez  and  Sayeed  to  other  home  health  care
companies instead of using them to bill for The Colony.[45]

In closing, Saper explained how Petitioner could have owned
The Colony without knowing about and participating in the pervasive
fraud involved.  Saper emphasized that Petitioner hired employees
who had health care and even home health care experience and
trusted them, that Petitioner had many different businesses to run,
that  he  came  to  run  The  Colony  only  because  his  partner  was
incapacitated after a traffic accident, that he left a signature
stamp  and  presigned  checks  at  the  office,  and  that  the  other
coconspirators were family members of each other but not of him.[46]
Saper argued that although some witnesses testified that Petitioner

---

[42]Day 2 Trial Transcript, Docket Entry No. 298, p. 113 lines
3-17.

[43]Id. at 121 lines 23-25, p. 122 lines 1-20.

[44]Id. at 110 lines 24-25, p. 111 lines 1-3; p. 242 lines 3-13.

[45]Id. at 116 lines 4-18.

[46]Day 3 Trial Transcript, Docket Entry No. 299, p. 177 lines
20-25, p. 178 lines 1-6, 1-17, 24-25, p. 179 lines 1-6, 10-19,
p. 180 lines 2-6.

often called the office to check in and was copied on emails, which
would have been on the seized Colony computers, the Government did
not offer any emails or phone records into evidence.[47]   Saper
concluded by arguing that the jury should not find Petitioner
guilty beyond a reasonable doubt because they could not trust
Smith, Sangolana, Bermudez, and Ekene.[48]

The jury found Defendant guilty on all counts — 1 through 9
and 16.[49]   Saper filed a Rule 29(c) Motion for Judgment of
Acquittal, arguing that the Government did not introduce any
evidence that the monetary transactions alleged in the indictment
were in or affecting interstate or foreign commerce.[50]   The court
denied the motion.[51]

Saper filed objections to the Presentence Investigation
Report ("PSR").[52]   Saper objected to the four-level increase in
Petitioner's base offense level for being a leader/organizer,
arguing that trial evidence showed that Petitioner did not exercise
day-to-day control over The Colony's activities, that Smith was the
one primarily in charge, and that 67% of the proceeds went to

---

[47]Id. at 183 lines 24-25, p. 184 lines 1-10.

[48]Id. at 185 lines 4-5.

[49]Verdict, Docket Entry No. 161, pp. 3-5.

[50]Rule 29(c) Motion for Judgment of Acquittal, Docket Entry
No. 176, p. 2 ¶ 2.

[51]Order, Docket Entry No. 215, p. 2.

[52]Objections to the Presentence Report, Docket Entry No. 210.

defendants other than Petitioner.[53]  Saper objected to the lack of a downward variance recommendation, arguing that Petitioner incorporated The Colony for his son's mother, Comfort Moore, and that he only left it open after her car accident in the hope that she would recover.[54]  Saper filed a sentencing memorandum, emphasizing Petitioner's age, his lack of criminal history, Moore's condition, and the sentencing disparity (compared to codefendants) that would result from the Government's recommended sentence of 120 months.[55]  The court sentenced Petitioner to 120 months in prison.[56]

## B.  Petitioner's Direct Appeal

After sentencing, Saper requested that he be allowed to withdraw as counsel and that appellate counsel be appointed, which the court granted.[57]  The court appointed Janet Blackburn to represent Petitioner on appeal.[58]  However on September 28, 2022, Petitioner requested that he be permitted to represent himself on appeal, and Blackburn filed a request to withdraw.[59]  After the

---

[53] Id. at 1-3.

[54] Id. at 3 ¶ 10, p. 4 ¶¶ 11-12.

[55] Sentencing Memorandum, Docket Entry No. 237, pp. 1-2.

[56] Judgment in a Criminal Case, Docket Entry No. 250, p. 3.

[57] Motion to Withdraw as Attorney of Record and to Appoint Appellate Counsel, Docket Entry No. 244, pp. 1-2; Order, Docket Entry No. 245; Order Appointing Counsel, Docket Entry No. 248.

[58] Order Appointing Counsel, Docket Entry No. 248.

[59] Request for the Extension of Surrender Date, Docket Entry No. 265, p. 1; Motion to Withdraw as Attorney of Record, Docket Entry No. 282.

court probed Petitioner's ability to represent himself and warned him of the dangers of doing so, Petitioner testified that he nevertheless wished to represent himself on appeal, and the court granted Blackburn's request to withdraw.[60]   Petitioner later asked for and was granted appointed counsel (Lourdes Rodriguez) by the Fifth Circuit to represent him on appeal.[61]

On appeal, Petitioner argued that the court incorrectly applied the enhancements under Fed. Sent. Guide. § 2B1.1(b)(2)(A)(i) for an offense involving more than 10 victims and § 2B1.1(b)(11)(C)(i) for unauthorized use of a means of identification unlawfully to obtain another means of identification.[62]   The Fifth Circuit affirmed Petitioner's sentence.[63]

## C.   Petitioner's § 2255 Motion

Petitioner argues that the following violations deprived him of a fair trial: (1) the Government offered evidence obtained from an unlawful search of The Colony,[64] (2) the Government concealed favorable evidence, i.e. the amount of money a coconspirator made from the fraud,[65] (3) Agent Nixon abused his power, (4) the

---

[60]Order, Docket Entry No. 301.

[61]Unnumbered Docket Entry on December 6, 2022.

[62]Opinion, Docket Entry No. 364, pp. 2-3.

[63]Id. at 3.

[64]Petitioner's § 2255 Motion, Docket Entry No. 373 (POLICE MISCONDUCT/U.S.C. 1986 VIOLATIONS), pp. 3-4.

[65]Id. at 4-5 (CONSPIRACY TO CONCEAL AND SUPPRESS EVIDENCE).

Government entered unlawful plea agreements with Petitioner's codefendants,[66] (5) the Government made racist remarks in its closing arguments,[67] (6) the evidence was insufficient to convict Petitioner,[68] (7) Petitioner's trial and appellate counsel were ineffective,[69] and (8) Petitioner's speedy trial rights were violated.[70]   Petitioner raises numerous other claims that are conclusory or duplicative of these eight alleged violations.[71]

**D.   Saper's Affidavit**

Saper provided a sworn affidavit addressing Petitioner's allegations of ineffective assistance.[72]   Regarding the FBI search, Saper states:

> I obtained a copy of the warrant and the probable cause affidavit and reviewed them.   The warrant recited facts indicating that services were billed for, but when the person who was to have received the services was

---

[66]Id. at 12-14 (4. Prosecutor committed legal fraud).

[67]Id. at 14 (6. Prosecutor invoked discrimination and Racism).

[68]Id. at 15-16.

[69]Id. at 22-34.

[70]Id. at 45-51.

[71]For example, Petitioner alleges that Nixon and Assistant United Stated Attorney Tina Ansari conspired to commit fraud on the court, but Petitioner's offered basis for this allegation is the alleged concealment of evidence.   Id. at 5.   Similarly Petitioner alleges that the unlawful search and seizure, conspiracy to conceal evidence, and conspiracy to commit fraud on the court all amount to a conspiracy to obstruct justice.   Id.

[72]Affidavit of Gus Saper ("Saper Affidavit"), Exhibit B to United States' Motion for Summary Judgment and Response ("Government's § 2255 Response and MSJ"), Docket Entry No. 388-1.

interviewed, they reported that they never received those services. Also, there were allegations that patients were paid to allow "Colony Home Health Services" to bill Medicare for services not rendered on their behalf. I determined based on my review of the warrant and affidavit that sufficient probable cause existed for the issuance of the warrant and that it had been issued and acted upon in good faith.[73]

Regarding his investigation of the case, Saper states:

I reviewed approximately 159 GB of discovery material. That material contained about 359 FBI 302 reports and many more witness interviews. In addition, there were bank records for nine individuals and companies. I reviewed numerous undercover recorded conversations and recorded interviews of co-defendants. I met with FBI Special Agent Paul Nixon and interviewed him at his warehouse office twice and by phone several more times.

Initially, COVID-19 somewhat hampered my work on this case, but I still met with Mr. Alatan on at least eighteen separate occasions and documented twenty-six phone conferences. I contacted attorneys for codefendants to determine whether their clients would plead or go to trial. I reviewed all plea agreements and the included factual basis for the pleas. All but one codefendant pled, and several testified during Mr. Alatan's trial.[74]

Regarding discovery, Saper states:

At all times Mr. Alatan had access to all the discovery materials in my possession and nothing was withheld from his view. . . . Mr. Alatan often visited my office to review the discovery and to prepare to testify on his behalf.[75]

Regarding a Government plea offer, Saper states:

The AUSA assigned to Mr. Alatan's case made a pretrial offer to allow Mr. Alatan to plead guilty to a

---

[73]Id. at 1.

[74]Id. at 1-2.

[75]Id. at 2.

superseding information alleging a violation of
18 U.S.C.A. 371, which would have limited his exposure to
no more than 60 months in prison. I presented that offer
orally to Mr. Alatan on more than one occasion and on
December 2, 2021, four and a half months before the trial
was to start, I emailed the offer to him. At the
pretrial conference, Judge Lake questioned whether
Mr. Alatan knew of the offer. Mr. Alatan acknowledged
that he knew of the offer, had rejected the offer, and
wished to proceed to trial.[76]

## II.  Legal Standards

### A.  Collateral Review Under 28 U.S.C. § 2255

Title 28 U.S.C. § 2255(a) states that a prisoner sentenced by

a federal court may move that court "to vacate, set aside or

correct the sentence" "upon the ground that the sentence was

imposed in violation of the Constitution or laws of the

United States . . . or is otherwise subject to collateral attack."

"A defendant can challenge a final conviction, but only on issues

of constitutional or jurisdictional magnitude." United States v.

Willis, 273 F.3d 592, 595 (5th Cir. 2001). "[T]o obtain collateral

relief a prisoner must clear a significantly higher hurdle than

would exist on direct appeal." United States v. Frady, 102 S. Ct.

1584, 1593 (1982).

The court "may not consider an issue disposed of in [the

defendant's] previous appeal at the § 2255 stage." United States

v. Goudeau, 512 F. App'x 390, 393 (5th Cir. 2013) (per curiam).

Similarly, a defendant generally may not raise claims in a § 2255

---

[76]Id.

motion that he has procedurally defaulted.  <u>United States v.</u>
<u>Vargas-Soto,</u> 35 F.4th 979, 993 (5th Cir. 2022).  "In general, [i]t
is well settled that where a defendant has procedurally defaulted
a claim by failing to raise it on direct review, the claim may be
raised in a § 2255 motion only if the petitioner can first
demonstrate either (1) cause and prejudice, or (2) that he is
'actually innocent' of the crime for which he was convicted."
<u>United States v. Torres,</u> 163 F.3d 909, 911 (5th Cir. 1999)
(internal quotation marks omitted).  To show cause, "the movant
'must show that some objective factor external to the defense
impeded counsel's efforts to comply with the [relevant] procedural
rule.'"  <u>Vargas-Soto,</u> 35 F.4th at 993 (quoting <u>Davila v. Davis,</u> 137
S. Ct. 2058, 2065 (2017)).

A court must grant an evidentiary hearing on a § 2255 motion
"[u]nless the motion and the files and records of the case
conclusively show that the prisoner is entitled to no relief."  28
U.S.C. § 2255(b).  "When facts are at issue in a § 2255 proceeding,
a hearing is required if (1) the record, as supplemented by the
trial court's personal knowledge or recollection, does not
conclusively negate the facts alleged in support of the claim for
§ 2255 relief, and (2) the movant would be entitled to
postconviction relief as a legal matter if his factual allegations
are true."  <u>United States v. Anderson,</u> 832 F. App'x 284, 287 (5th
Cir. 2020).  A petitioner's "conclusory assertions do not support
the request for an evidentiary hearing."  <u>United States v. Auten,</u>

632 F.2d 478, 480 (5th Cir. 1980).  Instead, a petitioner must produce "independent indicia of the likely merit of her allegations, typically in the form of one or more affidavits from reliable third parties." United States v. Cervantes, 132 F.3d 1106, 1110 (5th Cir. 1998); United States v. Edwards, 442 F.3d 258, 264 (5th Cir. 2006).

## B.   Ineffective Assistance of Counsel

"[A] claim for ineffective assistance of counsel is properly made in a § 2255 motion because it raises an issue of constitutional magnitude and, as a general rule, cannot be raised on direct appeal." United States v. Conley, 349 F.3d 837, 839 n.1 (5th Cir. 2003) (internal quotation marks omitted).  To prevail on an ineffective assistance of counsel claim, a convicted defendant must show (1) that defense counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant. Strickland v. Washington, 104 S. Ct. 2052, 2064 (1984).

Performance is deficient if the defendant's lawyer "made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 2065. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 2066.

-18-

To show prejudice a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 2068. For a trial error, the defendant must show that counsel's errors were "'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Harrington v. Richter, 131 S. Ct. 770, 787-88 (2011).

"In the plea bargaining context, a reasonably competent lawyer must attempt to learn all of the relevant facts of the case, make an estimate of the likely sentence, and communicate the results of that analysis to the client[.]" Brock-Miller v. United States, 887 F.3d 298, 308 (7th Cir. 2018). To establish prejudice in the context of a rejected plea offer, the "defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Lafler v. Cooper, 132 S. Ct. 1376, 1385 (2012).

## III.  Analysis

### A.   The FBI Search of The Colony's Office

Petitioner alleges several problems with the FBI's search of The Colony's office, specifically that "the police report . . . the

probable cause affidavit, search warrant, list of items taken during the search are [nowhere] to be found. Not even the criminal docket listed the search. . . . Yet, the unlawfully seized items were used as evidence[.]"[77]

This argument is procedurally defaulted because it could have been raised pretrial or on direct appeal but was not. See Torres, 163 F.3d at 911. Saper's Affidavit states that the search warrant and probable cause affidavit were available, that he reviewed them, and that Petitioner had access to and regularly reviewed discovery.[78] Petitioner — unable to show cause and prejudice or actual innocence — therefore cannot overcome the procedural default. See Torres, 163 F.3d at 911.

Based on Saper's Affidavit, there was no basis on which to challenge the probable cause affidavit, the search warrant, or the warrant's execution.[79] Moreover, Petitioner's complaint that these documents were not entered in the court's docket is meritless. A criminal docket is generally created upon the issuance of an indictment — not the opening of a criminal investigation. Search warrants and probable cause affidavits are generally not entered into the case's docket unless the parties attach them in briefing a motion to suppress evidence.

---

[77]Petitioner's § 2255 Motion, Docket Entry No. 373, p. 3.

[78]Saper Affidavit, Exhibit B to Government's § 2255 Response and MSJ, Docket Entry No. 388-1, pp. 1-2.

[79]Id. at 1.

## B.  The Government's Alleged Concealment of Evidence

Petitioner repeatedly challenges the alleged concealment of evidence regarding one of his employees, Grace Matthews. Petitioner states that the Government brought up in a proffer interview with Petitioner that Matthews had made $300,000 from The Colony in one year but never indicted her, never mentioned her at trial, and concealed evidence related to her.[80]

"[T]o establish a <u>Brady</u> violation [for failure to disclose evidence], a defendant must make the following showing: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" <u>Powell v. Quarterman,</u> 536 F.3d 325, 335 (5th Cir. 2008) (quoting <u>Strickler v. Greene,</u> 119 S. Ct. 1936, 1948 (1999)).

Despite arguing that evidence of Matthew's income from the scheme would have changed the outcome of Petitioner's trial, he does not explain how the evidence is favorable to him.  Moreover, Petitioner must show that the Government did not disclose the favorable evidence; it does not matter that the Government chose not to introduce the evidence at trial.  And because Petitioner has failed to explain how the evidence is at least favorable to him, he also fails to show that he suffered prejudice.  Petitioner's <u>Brady</u> challenge therefore fails.

---

[80]Petitioner's § 2255 Motion, Docket Entry No. 373, pp. 4-5.

**C.   Agent Nixon's Alleged Abuse of Power**

Petitioner argues that Nixon "abused his power several times by use of threat."[81]   Petitioner alleges that Agent made the following statements:

- At a proffer meeting:  "'A lady by [the] name Grace [M]atthews made well over $300,000.00 in one year. You better come and tell me all you know about the fraud that went on at [T]he Colony otherwise' . . ."

- "On 9/5/2019 after I was arrested and on our way to the FBI office, he says 'You will [spend] the rest of your life in prison.'"

- "Also, when we arrived at the Court House building, he shouted at one of the security guards by saying 'I have a prisoner for you.'"[82]

Coercing a defendant to plead guilty violates due process. <u>Busby v. Holman</u>, 356 F.2d 75, 78 (5th Cir. 1966).  Setting aside whether the alleged statements, if true, would amount to coercion (of which the court is skeptical), Petitioner faces several fundamental problems.  First, Petitioner – having gone to trial — cannot claim a coerced guilty plea.  Nor does he explain any way that Nixon's statements affected his trial or sentencing. Petitioner therefore cannot show that Nixon's statements caused him any prejudice.

**D.   The Government's Use of Plea Agreements**

Petitioner alleges that the Government entered into unlawful plea agreements with his codefendants (and declined to prosecute a

---

[81]Petitioner's § 2255 Motion, Docket Entry No. 373, p. 6.

[82]<u>Id.</u>

coconspirator) in exchange for testimony against Petitioner.[83] "[T]he government, particularly the United States Attorney's office, may offer an accomplice leniency in exchange for truthful testimony." <u>Perez v. United States,</u> 274 F. Supp. 2d 330, 335 (E.D.N.Y. 2003). "The decision to bring charges, and to consider a defendant's cooperation in making that decision, is at the core of prosecutorial discretion." <u>United States v. Oseguera Gonzalez,</u> 507 F. Supp. 3d 137, 178 (D.D.C. 2020). Petitioner presents no evidence that the Government asked Petitioner's codefendants to give anything but truthful testimony. Moreover, this argument is procedurally defaulted. Petitioner's challenge to the Government's use of plea agreements fails.

## E.   The Government's Allegedly Racist Closing Arguments

Petitioner alleges that the Government made the racist remark in its closing argument that "'[t]hese people are bad people[.]'"[84] "The Constitution prohibits racially biased prosecutorial arguments." <u>McCleskey v. Kemp,</u> 107 S. Ct. 1756, 1776 n.30 (1987). Having reread the transcript of the Government's closing argument, the court identified only the following passage that resembles Petitioner's quote:

> Nowhere did Dr. Sayeed or Dr. Ramirez see a patient. They did nothing. They made the easiest money in the world, as did many other people in this scheme, is they showed up

---

[83]Petitioner's § 2255 Motion, Docket Entry No. 373, p. 13.

[84]<u>Id.</u> at 14.

to sign a signature. Sign their signature and leave. And
they got $100,000 together to just sign. If someone said
to you, I will pay you $20,000 just to sign a signature,
it takes you five minutes, you'd probably do it. If
you're for sale. And if you're fraudulent. But not if
you're a good person.

<u>But none of these people were good.</u>  Ramirez wasn't good.
He was one of the biggest fraudulent doctors in America,
as you heard from Agent Nixon.  Dr. Sayeed wasn't good.
She was up for sale.   <u>None of these people were good
people.</u>  None of them.  But that's why Dr. Ekene or
Pastor Ekene did business with them.[85]

In context, the court is not persuaded that the use of "these
people" referred to the defendants' races.  The prosecutor's use of
the phrase was immediately preceded and followed by references to
particular coconspirators and their specific fraudulent conduct.
Petitioner's prosecutorial misconduct claim based on the
Government's use of the phrase "these people" therefore fails.

## F.   Sufficiency of the Evidence

Petitioner argues that the Government's evidence suffered from
several major flaws:  a lack of evidence that Petitioner was aware
of the fraud, a lack of evidence that Petitioner knew the FMGs were
not licensed in the U.S., a failure to distinguish payments for
recruiters from payments for Vietnamese translators, a lack of
evidence that Medicare bars the use of recruiters, and a lack of
evidence on medical necessity.[86]

---

[85] Day 3 Trial Transcript, Docket Entry No. 299, p. 200 lines
8-22 (emphasis added).

[86] Petitioner's § 2255 Motion, Docket Entry No. 373, pp. 15-16.

These challenges to the sufficiency of the evidence are procedurally defaulted and fail on the merits. As to his intent, Petitioner takes issue with the Government's use of post-raid billing as evidence that Petitioner was aware of and participated in the fraud. Petitioner argues that the alleged post-raid billing was actually for care that was initiated before the raid but was billed and paid out afterwards. But multiple witnesses testified that the scheme continued unchanged after the raid, with the only difference being that Dr. Sayeed filled the role of Dr. Ramirez (i.e. signing plans of care for patients that they had not seen).

Regarding the FMGs, the Government did not have to show that Petitioner knew they were unlicensed. To prove that Petitioner committed health care fraud, the Government had to show:

> *First:* That the defendant knowingly and willfully executed a scheme or artifice to defraud Medicare or to obtain money or property from Medicare, by means of false [or fraudulent pretenses or] representations in connection with the delivery of or payment for health care benefits, items, or services;
>
> *Second:* That the defendant acted with a specific intent to defraud Medicare;
>
> *Third:* That the false representations that the defendant used were material; and
>
> *Fourth:* That the operation of the health care benefit program affected interstate commerce.[87]

The Government offered ample evidence that Petitioner directed The Colony's scheme of knowingly billing Medicare — which involved

---

[87]Jury Charge, Docket Entry No. 158, pp. 12-13; see also Pattern Crim. Jury Instr. 5th Cir. 2.59 (2019).

representing that the billed home health care was medically necessary — despite knowing that the care was not medically necessary.  That evidence was sufficient to satisfy the health care fraud elements.

Even accepting as true Petitioner's argument that the Government's calculation of recruiter payments lumped in payments for translators, this would not detectably change the weight of evidence against Petitioner.  Witnesses testified that The Colony's business relied primarily or exclusively on recruited patients, that Petitioner was aware of and had to approve any recruiters, and that the patients did not need home health care.

The Government was not required to prove that Medicare bars the use of patient recruiters.  The use of recruiters was evidence that The Colony was billing for medically unnecessary home health care and that Petitioner was aware of that fact.  As Hull testified, patients who need home health care are generally referred by a physician following a medical event or new diagnosis. As Smith testified, a patient sick enough to need home health care is likely to seek out a doctor for care — not the other way around.

Petitioner argues that the Government's evidence was insufficient because it failed to present expert testimony that The Colony was billing for medically unnecessary care.  It is well established that expert medical testimony is not always needed in health care fraud cases.  United States v. Martinez, 921 F.3d 452, 475 (5th Cir. 2019) ("[S]o long as the jury was not forced to rely

-26-

on disconnected generalizations to conclude tests were not medically necessary, and instead had some evidence to support the impropriety of each claim, there will be sufficient evidence for the convictions."); <u>United States v. Betro,</u> 115 F.4th 429, 445 n.2 (6th Cir. 2024) ("[W]hile expert testimony as to legitimate medical purpose ... may be helpful to a jury, there are cases in which the lay testimony is so clear that no expert testimony is required to determine that the defendant's actions were not for a legitimate medical purpose.") (internal quotation marks omitted). The jury had sufficient evidence to conclude that the improper care charged in the Superseding Indictment was not medically necessary. Sangolana — a Colony nurse — testified that he falsely stated in Medicare paperwork that each of the four patients referenced in the Superseding Indictment were homebound.[88]   Two of the patients testified that the Medicare paperwork misrepresented their condition.   The use of paid recruiters (and even payments to patients) confirm that The Colony's patients did not need home health care.

## G.   Ineffective Assistance of Trial Counsel

Petitioner alleges that Saper failed to challenge the FBI search of The Colony,[89] failed to investigate or interview the

---

[88]Day 2 Trial Transcript, Docket Entry No. 298, p. 179 lines 17-25, p. 181 line 25, p. 182 lines 1-9, p. 184 lines 21-25, p. 185 lines 1-9.

[89]Petitioner's § 2255 Motion, Docket Entry No. 373, p. 22.

Government's witnesses (and Grace Matthews),[90] failed to call any defense witnesses,[91] failed to challenge weaknesses in the prosecution's evidence,[92] failed to subpoena coconspirators' bank records,[93] failed to impeach the Government's witnesses,[94] failed to present the Government's plea offer,[95] and failed to explain the sentencing guidelines.[96]  Petitioner alleges repeatedly that Saper conspired with Nixon and Ansari.[97]

### 1.   Saper's Decision to Not File a Motion to Suppress

Petitioner had access to the probable cause affidavit and search warrant as part of discovery.  Petitioner does not articulate any specific deficiency in the affidavit, the warrant, or the carrying out of the search.  Based on Saper's description of the documents, the FBI had probable cause to conduct the search and executed the warrant properly.  Moreover, Nixon testified at trial that prior to the search, the FBI had obtained recordings of Edem Ekene agreeing to pay an undercover recruiter for a physician-signed home health order, that The Colony billed Medicare for that

---

[90] Id. at 25-26.

[91] Id. at 26.

[92] Id. at 27.

[93] Id. at 28.

[94] Id. at 29.

[95] Id.

[96] Id. at 30.

[97] Id. at 22-24.

patient, and that the FBI's undercover recruiter was paid for referring that patient.[98]   The court concludes that it was not deficient for Saper to forego filing a motion to suppress.

> 2.   Saper's Decision to Not Interview More Witnesses

Saper reviewed "359 FBI [witness interview summaries] and many more witness interviews[,]" interviewed Nixon multiple times, and had communications with codefendants' lawyers.[99]   "Strickland does not require the interview of every potential witness.  The 'results of interviewing certain witnesses or other investigation may indicate that further pursuit of additional asserted witnesses will likely be a waste of time.'"   United States v. Gavin, 77 F. Supp. 3d 525, 529 (S.D. Miss. 2014) (emphasis in original) (quoting Bryant v. Scott, 28 F.3d 1411, 1419 n.13 (5th Cir. 1994)). Saper may reasonably have concluded from reading the interviews and summaries and from interviewing Nixon that personal interviews would not be fruitful, that he had everything he needed from the Government's interviews, or that his energies were best spent preparing in other ways.   Saper was well prepared for cross-examination and arguments, both of which carefully focused on discrediting the Government's evidence regarding Petitioner's knowledge.   Petitioner does not point to any weaknesses in the

---

[98]Day 3 Trial Transcript, Docket Entry No. 299, p. 54 lines 19-25, p. 55 lines 1-18.

[99]Saper Affidavit, Exhibit B to Government's § 2255 Response and MSJ, Docket Entry No. 388-1, p. 1.

witnesses' testimony that Saper was not prepared to exploit at trial.  Petitioner argues that Saper should have interviewed Grace Matthews, but Petitioner fails to explain her significance in the scheme or why he believes she would have yielded favorable evidence.  The court concludes that it was not deficient for Saper to forego conducting more witness interviews.

     3.   <u>Saper's Decision to Not Call Defense Witnesses</u>

"[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative."  <u>Day v. Quarterman,</u> 566 F.3d 527, 538 (5th Cir. 2009).  "Thus, to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."  <u>Id.</u>  Petitioner complains of Saper's decision to not call any defense witnesses but names only Grace Matthews as a potential witness.  Moreover, Petitioner fails to specify what favorable testimony she would have provided.  The court concludes that it was not deficient for Saper to forego calling defense witnesses.

### 4.  Saper's Decision to Not Subpoena Bank Records

Petitioner complains that Saper "did not find it necessary to subpoena the Bank accounts and statements" of Edem Ekene, Grace Matthews, or Rita Smith despite the large sums of money they made from the scheme.[100]  The payments to Edem Ekene and Rita Smith were well documented in the Government's evidence and therefore were available to Petitioner in discovery.  Subpoenas of these records would have been duplicative.  Petitioner does not explain Matthews' significance in the scheme or how her bank records could have been helpful.  The fact that coconspirators (assuming Ms. Matthews was one) made substantial money from the scheme does not negate Petitioner's guilt.  The court concludes that it was not deficient for Saper to forego subpoenas of these bank records.

### 5.  Saper's Impeachment of Government Witnesses

Petitioner complains that Saper did not more effectively impeach the Government's witnesses.  The "bare assertion that [defense] counsel had been ineffective because he failed to impeach the credibility of state witnesses is not sufficient to show that his counsel's performance was deficient[.]"  Nelson v. Scott, 77 F.3d 476 (5th Cir. 1995) (per curiam).  Saper made the reasonable (and probably wise) choice of not cross-examining witnesses who did not testify to Petitioner's knowledge of the fraud.  Saper

---

[100]Petitioner's § 2255 Motion, Docket Entry No. 373, p. 28.

-31-

emphasized that the witnesses other than Smith had relatively few substantive interactions with Petitioner.  Saper forced witnesses to admit that there were pre-signed checks and a signature stamp in the office and that they rarely saw Petitioner sign checks. Finally, Saper emphasized the benefits that Petitioner's coconspirators were receiving in exchange for their testimony. Moreover, Petitioner fails to articulate any basis for cross-examination that Saper should have but failed to cover.  The court concludes that Saper's cross-examination was not deficient.

### 6. Saper's Alleged Failure to Present a Plea Offer

Petitioner's complaint that Saper did not adequately inform him of the Government's plea offer is contradicted by the record. At the final pretrial conference, the court asked whether the Government had made a plea offer.[101]  On the record, the Government disclosed and Petitioner rejected the final plea offer:

> MS. ANSARI:  Yes, Your Honor.  The last offer that was conveyed, which was given to all of the defendants, was to refile an information -- a superseding information under 18 [U.S.C.] 371 for conspiracy to commit health care fraud.
>
> THE COURT:  And that would be a five-year statutory maximum?
>
> MS. ANSARI:  That's correct, Your Honor.
>
> THE COURT:  Okay.  Mr. Alatan, was that offer communicated to you?

---

[101]Final Pretrial Conference Official Reporter's Transcript of Proceedings, Docket Entry No. 352, p. 7 lines 1-8.

```
THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And did you discuss it with your lawyer?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And is it your decision not to accept the
offer?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you wish to go to trial next week?

THE DEFENDANT:  Yes, Your Honor.[102]
```

The benefit of the offer was plain — capping Petitioner's possible prison sentence at five years instead of the ten years possible under the Superseding Indictment (assuming no consecutive sentences).  Petitioner confirmed that Saper had communicated the offer to him and that he decided to not accept it.  The court concludes that Saper communicated the offer to Petitioner and, even if he had not, that Petitioner was not prejudiced because the offer was again communicated to Petitioner in open court.[103]

### 7.  Saper's Explanation of the Sentencing Guidelines

Petitioner complains that Saper could not adequately explain the Sentencing Guidelines and the First Step Act ("FSA"). Petitioner offers minimal detail, stating that Saper "could not

---

[102]Id. lines 13-25, p. 8 lines 1-7.

[103]Moreover, Petitioner, who must show that he would have accepted the plea offer but for counsel's error, is noncommital in his § 2255 Motion about whether he would have done so. Petitioner's § 2255 Motion, Docket Entry No. 373, p. 30 ("If only Mr. Gus Saper showed Mr. Alatan the copy of the plea agreement to Alatan to read and understand, he may not have gone to trial.").

explain to Mr. Alatan the amount of sentence years he was facing if found guilty" and that he is likely to spend only three to four years of his sentence in prison after applying the FSA and other credits.[104]   Petitioner fails to identify any particular part of the Sentencing Guidelines that Saper was unable to explain.   Petitioner also fails to show (and likely could not show) prejudice.   Because the low end of the advisory guideline range would have been 68 months higher than the statutory maximum of 120 months,[105] Saper's calculation would have had to be substantially wrong for it to affect his explanation of Petitioner's exposure.   Petitioner does not even state what exposure Saper estimated.   Moreover, Petitioner does not state outright that he would have accepted the Government's plea offer if Saper had adequately explained his sentencing exposure.   The court concludes that Petitioner has failed to show that Saper's explanation of the Sentencing Guidelines was deficient or that Petitioner was prejudiced.

---

[104]Id.

[105]Petitioner's total offense level was 36, and his criminal history category was I.   PSR, Docket Entry No. 224, p. 30 ¶ 115, pp. 30-31 ¶ 118.   But for the statutory maximum sentence of 120 months, that would have resulted in a Guidelines range of 188 to 235 months in custody.   Id. at 34 ¶ 143.   Even if the four-level leader or organizer enhancement that Saper challenged had been downgraded to a three-level manager or supervisor enhancement, Petitioner's base offense level would have been 35, resulting in an advisory guideline range of 168-210 months in custody — still far above the statutory maximum of 120 months.   See FCJ Federal Sentencing Guidelines Manual 5A Intro., Part A. Sentencing Table (11/1/23).

## H.   Ineffective Assistance of Appellate Counsel

Petitioner alleges that Rodriguez failed to consult him in preparing his appeal and in failing to raise certain issues on appeal.[106]   The Fifth Circuit has rejected the argument that appellate counsel "is constitutionally required to confer with his client about the legal issues to be presented on appeal." Hooks v. Roberts, 480 F.2d 1196, 1197 (5th Cir. 1973); see also Chatman v. Lumpkin, Civil Action No. H-21-1117, 2024 WL 2854273, at *17 (S.D. Tex. June 5, 2024). "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Smith v. Robbins, 120 S. Ct. 746, 765 (2000) (citing Jones v. Barnes, 103 S. Ct. 3308, 3313 (1983)). "[I]t is still possible to bring a Strickland claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." Id.; see also Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."). Petitioner's letter to Rodriguez includes 42 numbered arguments, some with page numbers (presumably record cites).[107]

---

[106]Petitioner's § 2255 Motion, Docket Entry No. 373, pp. 32-34.

[107]Letter titled "Issues," Attachment 5 to Petitioner's § 2255 Motion, Docket Entry No. 373-1, pp. 9-12.

From what Petitioner has submitted to the court, it is not clear that Petitioner gave Rodriguez enough information to evaluate many of these arguments.  More importantly, Petitioner does not show in his § 2255 Motion that any of these arguments were clearly stronger than the arguments Rodriguez raised.  Many of the arguments are raised by Petitioner's § 2255 Motion and are meritless for the reasons explained herein.  The court concludes that Petitioner has not shown that Rodriguez was deficient or that Petitioner was prejudiced by her decisions.

## I.   Speedy Trial Rights

Petitioner argues that his constitutional and statutory rights to a speedy trial were violated in this case, both from pre-indictment and post-indictment delays.  The Speedy Trial Act "requires that a defendant's trial commence within seventy days from his indictment or initial appearance, whichever is later." United States v. Harris, 566 F.3d 422, 428 (5th Cir. 2009) (citing 18 U.S.C. § 3161(c)(1)).  However, the seventy days excludes "[a]ny period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  18 U.S.C. § 3161(h)(7)(A).  Petitioner was first indicted in this case on

August 28, 2019.[108]   Starting 23 days after the Indictment on September 20, 2019, the court granted continuances — requested or unopposed by Petitioner — through April 18, 2022.[109]   Petitioner's trial began on April 19, 2022.[110]   The non-excluded time from Petitioner's original indictment through the beginning of his trial was therefore 24 days — well within the 70 days required by the Speedy Trial Act.

The Speedy Trial Act does not govern pre-indictment delays except that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."  18 U.S.C. § 3161(b). Petitioner was arrested after the Indictment was filed.[111]

"To determine whether a defendant's constitutional right to speedy trial has been violated [by post-indictment delay], this court typically balances four factors:  (1) the [l]ength of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant."  Harris, 566 F.3d at 432 (internal quotation marks omitted).  The Supreme Court has

---

[108]Indictment, Docket Entry No. 1, p. 4.

[109]Order, Docket Entry No. 29; Order, Docket Entry No. 58; Order, Docket Entry No. 62; Order, Docket Entry No. 64; Scheduling Order, Docket Entry No. 72; Order, Docket Entry No. 78;  Order, Docket Entry No. 80.

[110]1st Day of Jury Trial Minutes, Docket Entry No. 151.

[111]See Order for Issuance of Bench Warrant, Docket Entry No. 5.

"emphasize[d] that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." Barker v. Wingo, 92 S. Ct. 2182, 2193 (1972). Moreover, "[i]t will be the unusual case . . . where the time limits under the Speedy Trial Act have been satisfied but the right to a speedy trial under the Sixth Amendment has been violated." United States v. Bieganowski, 313 F.3d 264, 284 (5th Cir. 2002). Petitioner experienced post-indictment delays of about two-and-a-half years, but the delays were warranted by the complexity of the case and the time the lawyers and defendants needed to prepare for trial. Petitioner did not oppose the delays (and in fact requested some of them). Moreover, Petitioner has not shown that he was prejudiced by the delays.

The Sixth Amendment right to a speedy trial has no application until the defendant is formally accused — generally when he is indicted. United States v. Marion, 92 S. Ct. 455, 459 (1971). "The sole constitutional limit on the delay between the commission of a substantive offense and the initial accusation based on that conduct is the due process clause." United States v. Avalos, 541 F.2d 1100, 1107 (5th Cir. 1976). "[F]or preindictment delay to violate the due process clause it must not only cause the accused substantial, actual prejudice, but the delay must also have been intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused . . . or for some other impermissible, bad faith purpose." United States v. Crouch,

-38-

84 F.3d 1497, 1514 (5th Cir. 1996). Petitioner has not shown that
he was prejudiced by the Government's delay in indicting him.
Moreover, there is nothing in the record or Petitioner's § 2255
Motion suggesting that the Government's delays were deliberate
attempts to gain a tactical advantage. To the contrary, this was
a complex health care fraud case involving voluminous documentary
evidence. Saper's Affidavit states that he reviewed 159 gigabytes
of discovery material. The court concludes that Petitioner's
constitutional speedy trial rights were not violated.[112]

## IV. Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states
that a district court "must issue or deny a certificate of
appealability when it enters a final order adverse to the
applicant." A certificate of appealability will not issue unless
that applicant makes "a substantial showing of the denial of a
constitutional right," 28 U.S.C. § 2253(c)(2), which requires an
applicant to demonstrate "that reasonable jurists would find the
district court's assessment of the constitutional claims debatable
or wrong." Tennard v. Dretke, 124 S. Ct. 2562, 2565 (2004)
(quoting Slack v. McDaniel, 120 S. Ct. 1595, 1604 (2000)). Under
that controlling standard this requires a petitioner to show "that
reasonable jurists could debate whether (or, for that matter, agree

---

[112]Petitioner's speedy trial arguments also could have been
raised on direct appeal and are therefore procedurally defaulted.

-39-

that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 123 S. Ct. 1029, 1039 (2003) (internal quotation marks omitted).

A district court may deny a certificate of appealability, sua sponte, without requiring further briefing or argument. See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000). Because the court concludes that reasonable jurists could not find any of Petitioner's claims meritorious, a certificate of appealability will be denied.

## V. **Petitioner's Motion for Compassionate Release**

Petitioner asks the court to grant him compassionate release pursuant to 18 U.S.C. § 3582(c)(1), citing his own poor health and the incapacitation of Moore (his son's mother) and the lack of people available to care for her.[113]  Section 3582(c)(1)(A) states:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

---

[113]Petitioner's Motion for Compassionate Release, Docket Entry No. 367, pp. 7-10.

"We understand 'extraordinary' to mean 'beyond or out of the common order,' 'remarkable,' and synonymous with 'singular.'" United States v. Escajeda, 58 F.4th 184, 186 (5th Cir. 2023) (quoting Webster's New International Dictionary 903 (2d. ed. 1934; 1950)). "Although not dispositive, the commentary to the [Sentencing Guidelines] § 1B1.13 informs our analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release." United States v. Thompson, 984 F.3d 431, 433 (5th Cir. 2021).

The Government argues that Petitioner has failed to exhaust his administrative remedies within the Bureau of Prisons ("BOP") and that Petitioner's medical and family conditions do not qualify as extraordinary and compelling reasons for a reduction under the Sentencing Guidelines.[114]

Section 3582(c)(1)(A) makes clear that Petitioner can only bring a motion under that section after he has exhausted his administrative appeals within the BOP or if the facility warden does not act within 30 days of such a request. Petitioner fails to show that either condition is satisfied.

Section 1B1.13(b) recognizes instances when the Defendant's medical circumstances, age, or family circumstances rise to the level of extraordinary and compelling reasons for a sentence reduction:

---

[114]Government's Response to Defendant's Sentence-Reduction Motion, Docket Entry No. 382, pp. 5-7.

-41-

**(1)   Medical Circumstances of the Defendant.**--

* * *

**(B)**   The defendant is-

**(i)** suffering from a serious physical or medical condition . . . or

* * *

**(iii)** experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

* * *

**(2) Age of the Defendant.**--The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

**(3) Family Circumstances of the Defendant.**--

* * *

**(B)** The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

Petitioner states diagnoses that he has received but does not explain or submit evidence showing how they substantially diminish his ability to provide self-care within prison.   Regarding Petitioner's age, he shows neither that he is experiencing serious deterioration in health because of aging nor that he has served 75 percent of his sentence.   Regarding Moore's condition, Petitioner

-42-

is not Moore's only available caregiver.  Petitioner attaches
documentation that Moore resides at a skilled nursing facility.
Petitioner has not exhausted his administrative remedies within the
BOP that are required to bring a motion under 18 U.S.C.
§ 3582(c)(1)(A).  In the alternative, Petitioner has not satisfied
his burden of showing extraordinary and compelling reasons to
reduce his sentence.

## VI.   Conclusion and Order

Petitioner's § 2255 Motion presents claims that are meritless
and mostly procedurally defaulted.  Petitioner's ineffective
assistance of trial counsel claim fails because the record shows
that Saper investigated the charges and evidence against
Petitioner, he communicated the Government's plea offer to
Petitioner, and he ably represented Petitioner at trial.
Petitioner's Motion to Vacate, Set Aside or Correct A Sentence
Under 18 U.S.C. Section 2255 (Docket Entry No. 373) is therefore
**DENIED.**  Because the record conclusively shows that Petitioner is
not entitled to any relief, Petitioner's request for an evidentiary
hearing is **DENIED.**  Because the court concludes that no reasonable
jurist could find any of Petitioner's claims meritorious, a
certificate of appealability is **DENIED.**

Because Petitioner has not shown any extraordinary and
compelling reasons warranting a sentence reduction, Petitioner's

Motion for Sentence Reduction Under U.S.C. 3582(c)(1) Extraordinary and Compelling Reasons (Docket Entry No. 367) is **DENIED.**

The Clerk shall provide a copy of this Memorandum Opinion and Order to the parties.

**SIGNED** at Houston, Texas, on this 21st day of October, 2024.

                                 _____
                                         SIM LAKE
                          SENIOR UNITED STATES DISTRICT JUDGE